## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

CHANTEL SALAZAR,

               Plaintiff,

                                      Case No. 14-12935

          v.                         HON. TERRENCE G. BERG

TRIBAR MANUFACTURING, L.L.C.,

               Defendant.

_____/

## OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DKT. 12) AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DKT. 13)

Plaintiff Chantel Puffer (formerly "Chantel Salazar"), an ex-employee of Defendant Tribar Manufacturing, L.L.C., ("Tribar"), filed this lawsuit on July 28, 2014 alleging that Tribar terminated her employment in violation of the Americans with Disabilities Act ("ADA.")  (Dkt. 1).  On April 10, 2015, the parties filed cross-motions for summary judgment (Dkt. Nos. 12, 13).  The Court held oral argument on these motions on December 4, 2015.  For the reasons explained below, Plaintiff's motion for summary judgment (Dkt. 12) is **DENIED** and Tribar's motion for summary judgment (Dkt. 13) is **GRANTED**.

## I.    FACTUAL AND PROCEDURAL HISTORY

### A.  Tribar Hires and Promotes Plaintiff to Hourly Positions Subject to Its Attendance Policy.

Tribar employs approximately 300 hourly workers manufacturing injection-molded parts in its Howell, Michigan plant.  (Dkt. 13, p. 1).  On August 26, 2011,

Plaintiff  began work at Tribar as an hourly press operator (Puffer Dep., Dkt. 13, Ex. 3, at 71:8-15) assigned to the "D shift," an evening shift that ran from 5 p.m. to 5 a.m. (*id.* at 74:20-24).

As an hourly employee, Plaintiff was subject to Tribar's "point system" attendance policy—a policy that emphasizes that employee attendance and punctuality are "extremely important" to the company.  (Tribar Attendance Policy, Dkt. 13, Ex. 8).  Under this system, employees are assessed points when they are tardy or absent from work without permission:[1]  half a point for being tardy and a full point for being absent.  (*Id.*)  Upon accruing three points, employees lose the "Class A" bonus, resulting in a $.50 hourly decrease in their wages.  (*Id.*)  Accruing five points constitutes grounds for termination.  (*Id.*)  In addition, Tribar deducts one point when an employee achieves perfect attendance for one calendar month. (*Id.*)  Tribar posts a list showing employees' point totals in the lunchroom, and updates it on a weekly basis.  (Gary Decl., Dkt. 13, Ex. 1, p. 2).  Employees are responsible for tracking their point totals and can dispute any points with human resources manager Cathy Muylaert.  (*Id.*)

---

[1] The attendance policy also requires an employee who misses multiple days to provide a doctor's note detailing the nature of the illness and the number of days that the employee will miss.  (*Id.*) The parties dispute whether an employee accrues a point after a doctor's visit.  Plaintiff claims that a doctor's note results in no points, relying on the employee handbook that states that "[a]n absence or partial day can be excused by . . . [a] doctor's note," an approved personal day or official business like jury duty.  (Employee Handbook, Dkt. 13, Ex. 6).  Tribar argues that employees are assessed a point even if they have a doctor's note.  However, Tribar contends that under its unwritten doctor's note policy, employees absent for consecutive days are only assessed one point (as opposed to a point for every day missed) if they provide a doctor's note.  (Muylaert Dep., Dkt. 13, Ex. 2, 71:19-72:8).

During her new hire orientation, Plaintiff learned that to be considered "on time" to work, she needed to be at her work station five minutes before the start of her shift (by 4:55 pm) under Tribar's unwritten "five-minute rule." (Puffer Dep., at 74:25-75:5). Muylaert explained that Tribar implemented the five-minute rule so that workers from the outgoing and incoming shifts could discuss any relevant issues, like mechanical problems, that occurred during the prior shift. (*Id.* at 75:23-76:6). Tribar paid Plaintiff for these five minutes. (Gary Decl., at p. 2).

In February 2012, Plaintiff obtained a promotion from press operator to team lead in the D shift. (Puffer Dep., at 111:21-25). As team lead, Plaintiff managed press operators and conducted quality control. (*Id.* at 112:21-113:4).

## B. Plaintiff's Kidney Disease Diagnosis and Promotion to Janitor

On December 28, 2012, Plaintiff was diagnosed with stage-five kidney disease. (Dr. George Behrend, December 28, 2012 Note, Dkt. 12, Ex. 2). Two months later, on February 18, 2013, Tribar promoted Plaintiff to janitor, (Puffer Dep., at 131:25-132:6) increasing her hourly wage from $11.25 to $12.25 per hour (*id.* at 133:19-22). As a janitor, Plaintiff was responsible for cleaning the plant floor. (Muylaert Dep., at 58:8-14).

At the time of her promotion, Plaintiff was receiving hemodialysis[2] at a clinic—a process that took an average of four hours to complete. (Puffer Dep., at

---

[2] Hemodialysis is machine-based treatment for kidney disease that filters "wastes, salts and fluid" from the blood. The Mayo Clinic, *Hemodialysis*, http://www.mayoclinic.org/tests-procedures/hemodialysis/basics/definition/prc-20015015. It is the most common treatment for advanced kidney disease. *Id.*

3

130:20-25). Since Plaintiff's treatment began at 6 a.m., she spoke with Tribar plant manager Frank Gary about her schedule, and Gary adjusted her hours to 12 p.m. to 8 p.m.[3] (*Id.* at 139:11-141:15). Gary also gave her the flexibility to arrive late as needed, and provided her with his cell phone number to alert him about any late arrivals. (*Id.* at 142:11-21). In effect, Gary exempted Plaintiff from Tribar's attendance policy during the time she worked as a janitor. (Gary Decl., at p. 5).

On March 28, 2013, Plaintiff had surgery to implant a catheter—a procedure that allowed her to begin peritoneal dialysis.[4] (Puffer Dep., at 165:16-19). This method required Plaintiff to administer dialysis every four to six hours. (*Id.* at 151:20-24). In May 2013, Plaintiff told Gary that she needed to begin performing dialysis at home. (*Id.*) Tribar had a "closed campus" policy that prohibited employees from leaving the plant during their shifts; the policy also prohibited employees from going to their cars alone during their work time. (Dkt. 13, Ex. 17). Despite this policy, Gary agreed to allow Plaintiff to go home during her shift to administer dialysis. (Gary Decl., at p. 5). He did not ask Plaintiff to provide any medical documentation. (*Id.*)

After some time, Plaintiff stopped going home and instead began performing dialysis in her car, which was parked in Tribar's parking lot. (Puffer Dep., at

---

[3] Plaintiff does not remember what her hours were prior to the change of schedule. (*Id.* at 140:13-15).

[4] Peritoneal dialysis provides greater flexibility than hemodialysis and can be administered at home, at work or while traveling. The Mayo Clinic, *Peritoneal Dialysis*, http://www.mayoclinic.org/tests-procedures/peritoneal-dialysis/basics/definition/prc-20013164.

153:11-19).  In June 2013, some employees told Gary that they had observed Plaintiff administering dialysis in her car, and bringing McDonald's food into the plant for other employees.  (Gary Decl., at pp. 5-6)  Plaintiff was then called into a meeting with Gary, Sean Whittum,[5] and Muylaert where they spoke to Plaintiff about violating the closed campus rule.  (*Id.* at 6).  Plaintiff apologized for violating the closed campus rule by bringing in outside food to other employees (Puffer Dep., at 163:3-19) and explained for the first time that she was administering dialysis in her car (*id* at 160:15-24).  Plaintiff then told them that this would not happen again because she was going to begin administering dialysis overnight.  (Gary Decl., at p. 6).

### C.  Plaintiff Leaves Janitor Position to Return as a Team Lead.

In July 2013, Tribar posted an internal listing for a quality team lead for the B shift.  (*Id.* at p. 7).  Paul Rose, the B shift supervisor, had heard good things about Plaintiff's prior performance as a team lead for the D shift and asked Plaintiff to become one of his team leaders.  (Rose Dep., Dkt. 13, Ex. 4, 13:15-20).  Plaintiff was Rose's first choice for the job, and he selected her over 10 to 20 other applicants.  (*Id.* at 44:17-23).

When Plaintiff accepted the offer to return as a team lead, she understood that this position would not have the flexible schedule that she enjoyed as a

---

[5] Whittum is the general foreman at Tribar (10:8-9) and is responsible for overseeing the production floor and managing supervisors (13:9-12).  He was Plaintiff's superior.

5

janitor.[6]  (Puffer Dep., at 169:9-13).  The B shift, like the D shift, ran from 5 p.m. to 5 a.m. (*id.* at 174:1-3) and was subject to the five-minute rule (*id.* at 171:18-23). Plaintiff did not request a flexible schedule when she agreed to take the position. (*Id.* at 172:16-21).

### D. Plaintiff Begins Administering Dialysis at Work

In September 2013, Plaintiff requested permission to administer dialysis at work.  (Gary Decl., at p. 7).  Gary approved the request and told Plaintiff to use the maintenance room because he believed that it was "clean and relatively private." (*Id.* at p. 7).  Plaintiff used the maintenance room once (Puffer Dep., 232:8-10) but felt uncomfortable there because she found that the room was dirty and did not offer privacy (*id.* at 234:4-16).  She told Rose about the condition of the room and Rose allowed her to go home to administer dialysis.  (Rose Dep., at 48:1-13).  Plaintiff also administered dialysis in other locations in the plant, including an upstairs conference room (Puffer Dep., at 230:3-9), and in the corner of an upstairs balcony area (*id.* at 232:12-14).

In late September 2013, Plaintiff went to the hospital for treatment for peritonitis.[7]  (*Id.* at 280:4-6).  As a result, she had to administer additional dialysis treatments and learn how to adjust her dialysis machine.  (*Id.* at 294:5-11).  On October 10, 2013, Plaintiff's doctor sent a note to Tribar explaining that Plaintiff

---

[6] Tribar did allow Plaintiff to keep the higher wage she earned as a janitor.  (Gary Decl., at p. 7).

[7] Peritonitis, an inflammation of the membrane that lines the abdominal wall, can be caused by an infection acquired while administering peritoneal dialysis.  The Mayo Clinic, *Peritonitis*, http://www.mayoclinic.org/diseases-conditions/peritonitis/basics/definition/con-20032165.

had suffered from peritonitis and requested that Tribar provide Plaintiff a "clean and sanitary environment" to administer dialysis. (Dr. Vidooshi Maru, October 10, 2013 Note, Dkt. 13, Ex. 18). In response, Gary allowed Plaintiff to administer dialysis in the front office. (Gary Decl., at p. 8).

### E. Plaintiff is Repeatedly Late to Work

Soon after Plaintiff's return as a team lead,[8] Rose noticed Plaintiff repeatedly punching in after 4:55 p.m., accruing attendance points for violating the five-minute rule. (Rose Dep., at 59:6-14). Rose raised the issue with Plaintiff and she responded that she would try to make it to work on time. (*Id.* at 59:15-19). She did not tell Rose why she was late and Rose never asked. (*Id.* at 70:19-71:1).

This pattern continued from September to October 2013 and eventually Rose told Whittum, his superior, about Plaintiff's tardiness. (Whittum Dep., 85:3-4). Whittum later observed Plaintiff punching in late and told her that she could not continue arriving late to work.[9] (*Id.* at 76:18-77:1). Plaintiff told Whittum that she was having problems administering her dialysis during her sleep and that this prolonged her dialysis and made her late. (Puffer Dep., at 212:3-9). She explained that her dialysis machine was malfunctioning either because her husband rolled over the cord or because she tripped over the cord. (Whittum Dep., at 77:8-14). Whittum understood Plaintiff's statement as an explanation as to why she was late

---

[8] The exact date of Plaintiff's return to the team lead position is unknown.

[9] Whittum does not remember exactly when this conversation occurred but believes it took place close to Plaintiff's termination. (*Id.* at 84:23-85:2).

on that particular day, not as a general reason for her numerous late arrivals.  (*Id.* at 77:15-17).  He then told Plaintiff to try sleeping in a chair.  (Puffer Dep., at 212:3-9).  Whittum testified that he recommended sleeping in a chair because it had helped him to stay immobilized when he was injured in the past.  (Whittum Dep., at 82:5-7).

Plaintiff states that during this conversation she told Whittum that she needed an adjustment in order to keep her job.  (Puffer Dep., at 211:19-212:2).  She did not ask Whittum for an accommodation because it was not in his power to grant her an accommodation (*id.* at 223:18-21) but she states that she requested a meeting with management (*id.* at 213:9-11).

After speaking to Whittum, Plaintiff spoke with Muylaert[10] and told her that she wanted to set up a meeting with management to discuss her attendance points.[11]  (*Id.* at 308:25-309:3).  She then sought out Gary but when she attempted to speak with him, he told her that he was busy.  (*Id.* at 215:22-216:16).  She did not attempt to schedule another meeting.[12]  (*Id.* at 237:5-6).  In the end, Plaintiff admits

---

[10] It is unknown when this meeting occurred.

[11] Plaintiff originally testified that Muylaert laughed at her when she told Muylaert that she wanted to meet with management to discuss her points and her dialysis.  (*Id.* at 259:16-260:5).  She later clarified that she only told Muylaert that she wanted to discuss her points and did not mention her dialysis.  (*Id.* at 308:25-309:5).  She maintains that Muylaert laughed, and then told her to talk to Gary.  (*Id.* at 309:15-19).

[12] At first Plaintiff testified that she had tried to schedule a meeting with Gary multiple times.  (*Id.* at 279:2-3).  Later she stated that she only tried speaking with Gary once, but felt intimidated and did not try again.  (*Id.* at 304:14-24).  She claims that she did not insist on a meeting because she felt like she was a nuisance (*id.* at 219:10-16) and that Gary and Whittum did not want to deal with it.  (*Id.* at 278:17-279:30).

that she never communicated to Gary, Muylaert or her direct supervisor Rose that she was having trouble with her dialysis. (*Id.* at 303:16-304:3).

Plaintiff wanted an adjustment to her schedule (*id.* at 217:8-218:18) that would give her the flexibility to arrive to work late when necessary to finish her dialysis treatment (*id.* at 239:13-15). She concedes that she did not request this (or any other) accommodation but claims that she *would have* requested an accommodation had she had the opportunity to meet with Gary. (*Id.* at 222:1-10).

### F. Tribar Terminates Plaintiff's Employment

After Rose informed him of Plaintiff's attendance problems, Whittum checked Plaintiff's attendance point total in late October 2013 and asked Muylaert to verify its accuracy.[13] (Whittum Dep., at 71:19-72:7). According to Muylaert, Plaintiff had by that time accumulated eight and a half points. On October 28, 2013, Plaintiff arrived late again and was summoned to a meeting. (Puffer Dep., at 243:2-8). There Plaintiff met with Rose, Muylaert, and Whittum. (Muylaert Dep., 81:19-82:12). They told Plaintiff that she had accumulated eight and a half points and she was being terminated under the attendance policy.[14] (Puffer Dep., at 243:2-8). While disputing the precise number, Plaintiff acknowledges that she had over five

---

[13] Muylaert was in charge of monitoring and verifying employee attendance points. (Muylaert Dep., at 26:11-14).

[14] Including the half-point for the date of Plaintiff's termination, Tribar claims that Plaintiff had accrued a total of nine points. (Gary Decl., at pp. 8-9).

points on the day of her termination.[15]  Tribar points out that, since 2011, it has

fired over 100 employees for violating the attendance policy.  (Gary Decl., at p. 9).

     Believing that Tribar fired her because of her disability (Puffer Dep., at

244:17-23), Plaintiff filed suit on July 28, 2014 (Dkt. 1).  Plaintiff raises two counts

for relief: (1) discrimination and failure to accommodate under the ADA and (2)

discrimination and failure to accommodate under Michigan's Persons with

Disabilities Civil Rights Act ("PWDCRA.")  (*Id.*)  On April 10, 2015, the parties filed

cross-motions for summary judgment.  (Dkt. Nos. 12, 13).

## II.  ANALYSIS

### A.  Standard of Review

     "Summary judgment is appropriate if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with any affidavits, show that

there is no genuine issue as to any material fact such that the movant is entitled to

a judgment as a matter of law."  *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563,

568 (6th Cir. 2013); *see also* Fed. R. Civ. P. 56(a).  A fact is material only if it might

affect the outcome of the case under the governing law.  *See Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 249 (1986).  On a motion for summary judgment, the

---

[15] According to her timesheets, Plaintiff arrived after 4:55 pm and was assessed points on July 27, 2013, July 28, 2013, July 31, 2013, August 14, 2013, August 23, 2013, August 24, 2013, September 16, 2013, September 17, 2013, September 19, 2013, September 20, 2013, October 6, 2013, October 9, 2013, October 24, 2013, and October 28, 2013.  (Puffer Timecards, Dkt. 13, Ex. 16).  In addition, she was assessed two more points for absences for absences where Plaintiff provided a doctor's note, the first from September 25 to 26, 2013, and the second on October 23, 2013.  (*Id.*)  Under Tribar's interpretation of the attendance policy, the late arrivals and absences total nine points.  Tribar did not assess points for Plaintiff's late arrivals on August 5, 2013, August 16, 2014, September 8, 2013, October 5, 2013, and October 14, 2013.  Neither side addresses the reasons for these tardy arrivals or explains why points were not assessed for them.

10

Court must view the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted); *Redding v. St. Edward*, 241 F.3d 530, 531 (6th Cir. 2001).

"As the moving parties, the defendants have the initial burden to show that there is an absence of evidence to support [plaintiff's] case." *Selhv v. Caruso*, 734 F.3d 554 (6th Cir. 2013); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the non-moving party "'may not rest upon its mere allegations or denials of the adverse party's pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial.'" *Ellington v. City of E. Cleveland*, 689 F.3d 549, 552 (6th Cir. 2012) (citing *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir.2009)).

### B. Discussion

On cross-motions for summary judgment, courts "must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, 10A Fed. Prac. & Proc. Civ. § 2720 (3d ed.). Accordingly, the Court will examine each party's motion in turn.

11

### 1. Plaintiff's Motion for Summary Judgment

Plaintiff seeks summary judgment for discrimination and failure to accommodate under the ADA and PWDCRA.[16]  The Court will analyze the two statutes together because the PWDCRA "substantially mirrors" the ADA.  *See Cotter v. Ajilon Servs., Inc.*, 287 F.3d 593, 597 (6th Cir. 2002) *abrogated on other grounds by Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312 (6th Cir. 2012) (en banc).

### a. Disability Discrimination

Title I of the ADA forbids discrimination against a "qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).

Because Plaintiff does not present any direct evidence that Tribar discriminated against her based on her disability, such as statements of managers, or employment-related documents, that directly reference her disability as a reason for the adverse employment action, Plaintiff's claim relies on indirect evidence of

---

[16] The Court notes that Plaintiff's motion for summary judgment makes various assertions of fact that are unsupported by the record, including, for example:
- That Whitman confronted Plaintiff and told her that she could not perform dialysis in her car (Dkt. 12, p. 2).  Plaintiff testified that she did not remember being told not to administer dialysis in her car.  (Puffer Dep., 162:13-15).
- That Plaintiff performed dialysis in a bathroom and was forced to use a second floor ledge in the main warehouse.  Plaintiff did not testify about administering dialysis in a bathroom.  Further, she testified that she administered dialysis on the second floor ledge because it was private, not because she was forced to use it.  (Puffer Dep. 232:12-16).
- That Plaintiff asked to administer dialysis in her car.  There is no evidence that Plaintiff ever made this request.

12

discrimination.  Claims involving indirect evidence of discrimination under the ADA follow the *McDonnell Douglas* burden-shifting framework.[17]  *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1105 (6th Cir. 2008).  Under this framework, a plaintiff must first establish a prima facie claim of discrimination by showing that "(1) he is disabled, (2) he is otherwise qualified to perform the essential functions of a position, with or without accommodation, and (3) he suffered an adverse employment action because of his disability."  *Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 433 (6th Cir. 2014) (citing *Talley*, 542 F.3d at 1105).[18]  The third-factor requires that a plaintiff show that his disability was a "but for" cause of the adverse employment action.  *Lewis*, 681 F.3d at 321.

---

[17] "An employee may prove discrimination based on his or her disability in two ways.  The first is by putting forward direct evidence that the defendant had a discriminatory motive in carrying out its employment decision.  *See Robinson v. Runyon*, 149 F.3d 507, 512–14 (6th Cir.1998) (discussing the difference between direct versus circumstantial proof in a Title VII case).  Such evidence would take the form, for example, of an employer telling an employee, 'I fired you because you are disabled.'  Because 'rarely will there be direct evidence from the lips of the defendant proclaiming his or her ... animus,' *id.*, employees have a second method to prove discrimination: the indirect burden-shifting approach first articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)."  *Smith v. Chrysler Corp.*, 155 F.3d 799, 805 (6th Cir. 1998)

[18] The Court notes that the correct test for establishing a prima facie claim of indirect discrimination is not entirely clear in the Sixth Circuit.  A Sixth Circuit panel has rejected the three-part test quoted above in favor of a five-part test, *Whitfield v. Tenn.*, 639 F.3d 253, 258-59 (6th Cir. 2011) (holding that a prima facie claim requires a plaintiff to show that "1) he or she is disabled; 2) otherwise qualified for the position, with or without reasonable accommodation; 3) suffered an adverse employment decision;  4) the employer knew or had reason to know of the plaintiff's disability; and 5) the position remained open while the employer sought other applicants or the disabled individual was replaced.") (quoting *Macy v. Hopkins Cnty. Sch. Bd. of Educ.*, 484 F.3d 357, 365 (6th Cir. 2007).  Some Sixth Circuit panels have followed *Whitfield*.  *See Curtis v. Humana Military Healthcare Servs., Inc.*, 448 F. App'x 578, 578 (6th Cir. 2011); *Arthur v. Am. Showa, Inc.*, 625 F. App'x 704, 705 (6th Cir. 2015), *Hurtt v. Int'l Servs., Inc.*, No. 14-1824, 2015 WL 5332531, at *1 (6th Cir. Sept. 14, 2015); *Neely v. Benchmark Family Servs.*, No. 15-3550, 2016 WL 364774, at *1 (6th Cir. Jan. 26, 2016).  Other panels have continued to apply the three-part test even after *Whitfield*.  *See Demyanovich*, 747 F.3d at 433; *Blazek v. City of Lakewood, Ohio*, 576 F. App'x 512, 513 (6th Cir. 2014); *Johnson v. Univ. Hosps. Physician Servs.*, 617 F. App'x 487, 487 (6th Cir. 2015).  In addition, courts in this district continue to apply the three-part test.  *See Ferrari v. Ford Motor Co.*, 96 F. Supp. 3d 668 (E.D. Mich. 2015) (discussing this issue in detail); *see also Schindewolf v.*

If the plaintiff can establish a prima facie claim, the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason for its actions." *Talley*, 542 F.3d at 1105 (internal quotation marks omitted).  If the defendant makes this showing, the burden shifts back to the plaintiff to "show by a preponderance of the evidence that the proffered explanation is a pretext for discrimination." *Id.*

Turning to the prima facie requirement, the only elements at issue are whether Plaintiff was qualified for the position and whether she suffered an adverse action because of her disability.[19]

 "An employee who cannot meet the attendance requirements of the job at issue cannot be considered a 'qualified' individual protected by the ADA."  *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1047 (6th Cir. 1998) (internal citation omitted).  The record demonstrates that Tribar considered its employees' attendance and punctuality extremely important to its operations.  Tribar instituted a point system, closely monitored it, and tied this system to employee compensation and tenure.  The record contains ample evidence showing that Plaintiff failed to comply with Tribar's attendance policy by arriving late on multiple occasions and by missing work.  Plaintiff acknowledges having more than five points as a result of these failures.  Viewing these facts in the light most

---

*City of Brighton*, 107 F. Supp. 3d 804, 808 (E.D. Mich. 2015).  Here, both parties agree that the three-part test applies.  Because the result in this case would be the same under either test, the Court will apply the three-part test.

[19] For purposes of these motions, Tribar does not contest that Plaintiff is disabled under the ADA.

favorable to Tribar, the non-moving party, there is at least a question of fact whether Plaintiff was a qualified employee based on her noncompliance with the attendance policy.  Plaintiff, therefore, is not entitled to summary judgment.

Plaintiff relies on *Fritz v. Mascotech Auto. Sys. Grp.*, Inc., 914 F. Supp. 1481 (E.D. Mich. 1996) to argue that she is entitled to summary judgment.  In *Fritz*, the court denied the defendant's motion for summary judgment because it held that there was a question of fact as to whether a chronically late employee could nonetheless be deemed qualified if provided with a reasonable accommodation.  But *Fritz* stands for the proposition that a chronically tardy employee may be a qualified employee under the ADA, not that such an employee is per se qualified.

Because there is at least a question of fact whether Plaintiff was a qualified employee, Plaintiff's motion for summary judgment is **DENIED** as to Count One.

### b.  *Failure to Accommodate*

To establish a prima facie claim for failure to accommodate, a Plaintiff must show that "(1) she is disabled within the meaning of the Act; (2) she is otherwise qualified for the position, with or without reasonable accommodation; (3) her employer knew or had reason to know about her disability; (4) she requested an accommodation; and (5) the employer failed to provide the necessary accommodation."  *Johnson v. Cleveland City Sch. Dist.*, 443 F. App'x 974, 982-83 (6th Cir. 2011).[20]

---

[20] The ADA provides an independent claim for failure to accommodate—the claim Plaintiff relies on here—and a claim for discrimination for failure to accommodate.  *See Anderson v. General Motors*,

This claim, like Plaintiff's disability discrimination claim, requires that Plaintiff show that she was qualified for the team lead position. As explained above, there is at least a question of fact as to whether Plaintiff was qualified for the team lead position. Accordingly, Plaintiff's motion for summary judgment is **DENIED** as to Count Two.

For the reasons explained above, Plaintiff's motion (Dkt. 12) is **DENIED**.

### 2. Tribar's Motion for Summary Judgment

The Court next turns to Tribar's motion for summary judgment on Plaintiff's counts of discrimination and failure to accommodate under the ADA and PWDCRA.

### a. *Disability Discrimination*

Beginning with the first step of the *McDonnell Douglas* framework outline described above, the Court will examine whether Plaintiff has made a prima facie claim of disability discrimination. Here, the inquiry centers on two elements: (1) whether Plaintiff was qualified to perform the essential functions of her position, with or without accommodation; and (2) whether she suffered an adverse employment action because of her disability.

---

*L.L.C.*, 45 F. Supp. 3d 662, 670 (E.D. Mich. 2014). To establish a claim of discrimination for failure to accommodate, the following factors must be met: "(1) The plaintiff bears the burden of establishing that he or she is disabled. (2) The plaintiff bears the burden of establishing that he or she is 'otherwise qualified' for the position despite his or her disability: (a) without accommodation from the employer; (b) with an alleged 'essential' job requirement eliminated; or (c) with a proposed reasonable accommodation. (3) The employer will bear the burden of proving that a challenged job criterion is essential, and therefore a business necessity, or that a proposed accommodation will impose an undue hardship upon the employer." *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 869 (6th Cir. 2007). In this case, Plaintiff does not allege discrimination for failure to accommodate.

(i) <u>Qualified to perform the position's essential functions</u>

The ADA defines the term "qualified individual" as one who:

> with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. For the purposes of this subchapter, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.

42 U.S.C. § 12111(8). "Essential functions generally are those that the employer's judgment and written job description prior to litigation deem essential." *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 761-62 (6th Cir. 2015) (en banc).

For Tribar, attendance and punctuality were essential job functions. Tribar's attendance policy described punctuality as "extremely important." According to Tribar, this policy included the unwritten five-minute rule that required employees to be present at their workstations five minutes prior to the start of their shifts. Tribar enforced its policy through its point system and tied the policy to compensation (in the form of reduced wages for absent employees) and termination. Attendance was therefore an essential job function.

An employee who excessively violates an employer's attendance policy is not qualified as a matter of law. *See Brenneman v. MedCentral Health Sys.*, 366 F.3d 412, 418-19 (6th Cir. 2004). In *Brenneman*, a health care worker who suffered from diabetes missed work nearly 200 times and was late over 34 times over the course of his employment. *Id.* at 416. The plaintiff never alerted his employer that his

17

diabetes caused his attendance problems. *Id.* The Sixth Circuit held that this excessive tardiness rendered the employee unqualified as a matter of law. *Id.* at 418-19.

As in *Brenneman*, Plaintiff here had significant attendance problems, albeit less extreme. From July 27, 2013 until her termination on October 24, 2013, Plaintiff was late 19 times and missed four days of work.[21] Further, she did not inform her supervisors that her dialysis was responsible for her chronic attendance problems. Thus, while Plaintiff was qualified for some of the essential functions of the team lead position, like managing employees, her tardiness and attendance problems rendered her not qualified as a matter of law to meet the essential functions of Tribar's attendance requirements.

Plaintiff's recourse to *Fritz* does not alter this conclusion. In *Fritz*, the district court held that a defendant could only prevail as a matter of law if the record showed "*both* that attendance and punctuality were essential functions . . . *and* that [d]efendant's reasonable attempts to accommodate [p]laintiff failed to enable him to satisfy those functions." 914 F. Supp. at 1489 (emphasis in original). This case is different, however. In *Fritz*, the defendant knew that the diabetic plaintiff needed an accommodation to his schedule and imposed strict conditions on the plaintiff, such as requiring him to obtain a doctor's note every time his diabetes caused him to be late to work. *Id.* at 1484-85. The defendant also rejected two proposed accommodations that the plaintiff requested for his schedule. *Id.* at 1490.

---

[21] The parties dispute Plaintiff's point total at the time of her termination. This issue is discussed in detail below.

Unlike in *Fritz*, Tribar's attendance policy applied to all employees, not just to Plaintiff. In addition, in contrast to the situation in *Fritz,* Tribar did not know, and Plaintiff did not communicate, that Plaintiff's absences and tardiness were related to problems with her dialysis machine. Nor did Plaintiff ever propose an accommodation to her schedule. The reasoning in *Fritz* is therefore inapplicable. Here, the record demonstrates that Plaintiff was not qualified as a matter of law because she could not meet the team lead position's essential functions.

(ii) <u>Adverse action because of her disability</u>

Even if Plaintiff could raise a question of fact that she was qualified, her prima facie claim would fail because she cannot establish that she suffered an adverse action because of her disability. An adverse action is a "materially adverse change in the terms or conditions of . . . employment because of the employer's conduct." *Talley*, 542 F.3d at 1107 (internal quotation marks omitted). Plaintiff must also show that her disability was a "but for" cause of the employer's adverse action. *Lewis*, 681 F.3d at 321.

Although Plaintiff's termination clearly qualifies as an adverse action, the record is bereft of any suggestion that "but for" her disability, she would not have been fired. Because of her poor attendance, Plaintiff accrued over five points—the threshold for termination under Tribar's attendance policy. Moreover, Plaintiff testified that she never informed Gary that her attendance issues were related to her dialysis. In the absence of any evidence showing that Tribar had knowledge that Plaintiff's problems with her dialysis machine caused her tardiness, it is

19

difficult to conclude that Plaintiff's disability was a "but for" cause of the decision to terminate her. In fact, the record suggests that Tribar did not have animosity against Plaintiff because of her disability because Tribar accommodated Plaintiff's disability numerous times. As a janitor, Plaintiff had been granted an exemption from Tribar's attendance policy, allowed to adjust her schedule, and permitted to arrive late to work as needed. Tribar later exempted Plaintiff from its closed campus policy by allowing her to go home during work hours to administer dialysis. Lastly, it authorized Plaintiff to perform dialysis in the company's front office.

In light of the record, Plaintiff has failed to raise a question of fact that her disability was a "but for" cause of her termination. Based on these two grounds, the Court holds that Plaintiff has failed to plead a prima facie claim of discrimination.

### (iii)   Nondiscriminatory basis for Tribar's actions and pretext

Even were the Court to hold that Plaintiff had set forth a prima facie claim, Plaintiff's claim would not meet the remaining steps of the *McDonnell Douglas* framework. Defendant has met its burden at the second step of articulating a legitimate, nondiscriminatory reason for its action, namely that it fired Plaintiff pursuant to its neutral attendance policy. Plaintiff therefore has the burden of showing that "by a preponderance of the evidence that the proffered explanation is a pretext for discrimination." *Talley*, 542 F.3d at 1105.

"A plaintiff will usually demonstrate pretext by showing that the employer's stated reason for the adverse employment action either (1) has no basis in fact, (2)

was not the actual reason, or (3) is insufficient to explain the employer's action."

*White v. Baxter Healthcare Corp.*, 533 F.3d 381, 392-93 (6th Cir. 2008).

At the outset, Plaintiff's failure to respond to Tribar's motion for summary judgment provides independent grounds for concluding that Plaintiff has not made a showing of pretext. Moreover, the record provides no evidence of pretext here. Under Tribar's attendance policy, Tribar had grounds for terminating Plaintiff once she accrued five points. According to Tribar, on the date of her termination, October 28, 2013, Plaintiff had accrued nine points. Plaintiff's main contention (in her motion for summary judgment) is that she only had four and a half points on October 28, 2013. Plaintiff arrives at this figure because she argues that any points assessed pursuant to Tribar's five-minute rule were improper because the five-minute rule was unwritten.

This argument is not well-taken. "Whether a policy is written or unwritten has minimal probative value on the issue of pretext. It may tend to prove that a defendant attaches little weight to the policy, but this can be rebutted by evidence that the policy was reliably communicated by the employer to its employees and that it was consistently enforced. Similarly, it is not the function of courts to judge the wisdom of particular business policies, but to ensure that such policies are made on a rational basis." *Stein v. Nat'l City Bank*, 942 F.2d 1062, 1065 (6th Cir. 1991).

Plaintiff admits that Rose told her that she would be subject to the five-minute rule when she chose to return as a team lead and she knew about this rule for a long time because Muylaert explained it to her during her new-hire

21

orientation.  Tribar enforced this rule and fired over 100 employees for violating the attendance policy during Plaintiff's tenure with the company.  And the rule had a rational basis because Tribar implemented it to encourage effective communication between the outgoing and incoming shift in order to promote greater efficiency, product quality, and productivity.

Having determined that the unwritten five-minute rule was valid, the Court turns to whether Tribar had grounds to terminate Plaintiff under its attendance policy.  Tribar claims that Plaintiff had accrued nine points by October 28, 2013.  Two of these points were the result of Tribar's unwritten doctor's note rule.[22] Plaintiff was assessed a point for being absent on September 25 and 26, 2013, and another point for being absent on October 23, 2013.  According to Tribar's written employee handbook, an absence can be excused via a doctor's note.  Here, there is some evidence that Plaintiff produced a doctor's note to excuse these absences. (Puffer Timecards, Dkt. 13, Ex. 16).  Consequently, the Court will assume that Tribar improperly assessed these two points.

However, even without counting these two points, Plaintiff's late arrivals from July 27, 2013 through her termination on October 28, 2013 totaled seven points, two points more than the five-points necessary to trigger termination.  In addition, there is evidence that Tribar did not assess points for five other occasions when Plaintiff was late.  Had points been assessed for those tardy arrivals,

---

[22] Tribar assesses one point to employees for being absent, even if they have a doctor's note. However, if an employee provides a doctor's note and is absent for consecutive days, Tribar only assesses one point for the entire absence (as opposed to a separate point for every day missed).

Plaintiff's point total would have risen to nine and a half.[23]  The record thus reflects that Tribar had a non-discriminatory reason for terminating Plaintiff under its employment policy, and no evidence of pretext has been offered.  For these reasons, Defendant's motion for summary judgment is **GRANTED** as to Count One.

### b.  Failure to Accommodate

A prima facie claim for failure to accommodate requires Plaintiff to show that "(1) she is disabled within the meaning of the Act; (2) she is otherwise qualified for the position, with or without reasonable accommodation; (3) her employer knew or had reason to know about her disability; (4) she requested an accommodation; and (5) the employer failed to provide the necessary accommodation."  *Johnson v. Cleveland City Sch. Dist.*, 443 F. App'x 974, 982-83 (6th Cir. 2011).  After a plaintiff establishes a prima facie case, "the burden shifts to the employer to demonstrate that any particular accommodation would impose an undue hardship on the employer."  *Id.* at 983.

According to the record before the Court, Plaintiff cannot make out a prima facie claim for two reasons.  First, as explained above, Plaintiff was not qualified for the position because she was unable to perform all of the essential conditions of the job—including complying with the attendance policy.  Second, Plaintiff did not make a request for an accommodation.

---

[23] These uncounted late arrivals include August 5, 2013, August 16, 2013, September 8, 2013, October 5, 2013, and October 14, 2013.

"The employee bears the burden of proposing reasonable accommodation; an employee's claim must be dismissed if the employee fails to identify and request such accommodations."  *Id.*  Plaintiff testified that she never requested an accommodation to her schedule after she became a team lead.  She made one attempt to meet with Gary but after he told her that he was busy, she never tried again.

The closest Plaintiff came to requesting an accommodation occurred in a conversation that she had with Whittum.[24]  In this encounter, Plaintiff testifies that she told Whittum that she needed "an adjustment," a term which she describes as "some kind of solution . . . so I don't lose my job over this [.]"  She states:

> I said – I had – just recently had tried to talk to [Gary], and he was busy.  So I talked to him.  I said, I tried to get – talk to [Gary] about this, he's busy.  I'm trying to come up with a solution.  My dialysis isn't working as well as I thought it would, and I need – would – **I need an adjustment**, is what I told him.  I need some kind of solution that we can come up to so that I don't lose my job over this, because I really value my job.
>
> And I explained to him what happened while I did dialysis, the alarms goes off, it stops dialysis, things happen, cords get clamped; certain things like that can happen that are not necessarily always in my control.

(Puffer Dep., 211: 19-212:7) (emphasis added).  While Plaintiff's description of this conversation clearly amounts to broaching the general topic of needing some kind of accommodation, Plaintiff concedes that she did not actually request an

---

[24] The parties dispute who initiated the conversation.

accommodation from Whittum because she did not think it was in his power to

grant one:

> Q.  What I'm asking, though, is:  Did you tell Sean [Whittum] that
> you – or did you suggest or recommend anything specific to Sean?
> A.  No.  I was asking what he thought I should do.

(*Id.* at 212:21-24).  Whittum's recollection of this conversation was not that Plaintiff

told him that she needed an adjustment but that she told him that her machine was

malfunctioning because of problems with her cord.  He thought that Plaintiff was

explaining why she was late on that particular day, rather than giving a general

reason for her numerous late arrivals.  (*Id.* at 77:15-17).  He did not understand her

to be identifying or requesting any particular accommodation.  Even taking

Plaintiff's version of the conversation alone as true, however, it does not say that

she identified or requested an accommodation.

Indeed, Plaintiff's testimony makes it clear that she never actually requested

a schedule-related adjustment:

> Q.  You never asked Mr. Whittum for any type of accommodation,
> did you?  You never said, I would like to see this happen to
> my schedule, I would like Tribar to do this for me, I need
> Tribar to do this?
> A.  That wasn't up to him.  That needed to be a meeting.
> Q.  That's my point.
> A.  That wasn't up to him.
> Q.  You didn't ask him to do anything for you as it related to your
> attendance issues or your dialysis, right?
> A.  Correct.
> Q.  Okay.  So my point it:  At no point during your employment
> with Tribar, did you ever ask for some type of an
> accommodation due to your dialysis or your medical condition
> that wasn't granted, right?
> A.  Not that I can recall.

25

(Puffer Dep., at 223:18-224:2). In sum, there is no genuine issue of fact presented by the record on the question of whether Plaintiff ever identified and requested a particular accommodation for her disability, she did not. As this was her burden to bear, Plaintiff's claim for failure to accommodate must fail. For this reason, Defendant's motion for summary judgment as to Count Two is **GRANTED**.

### III. CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment is **DENIED**. Tribar's motion for summary judgment is **GRANTED**.

**SO ORDERED.**

Dated: March 1, 2016            s/Terrence G. Berg
                                        TERRENCE G. BERG
                                        UNITED STATES DISTRICT JUDGE

### Certificate of Service

I hereby certify that this Order was electronically submitted on March 1, 2016, using the CM/ECF system, which will send notification to all parties.

                                        s/A. Chubb
                                        Case Manager